# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF RHODE ISLAND

In re: Bk. No. 25-10473
Chapter 7

Steven Gautier,
Debtor

John Borges,
Plaintiff

v. Adv. Pro. No. 25-01006

Steven Gautier,
Defendant

## MEMORANDUM OF DECISION

### I. INTRODUCTION[1]

Pursuant to 11 U.S.C. § 523(a)(6) Plaintiff, John Borges, commenced this adversary proceeding to determine the nondischargeability of debts and award of damages that relate to injuries he sustained during an altercation with the Defendant, Steven Gautier, on the evening of May 6, 2023 (Doc. #1, the "Complaint"). Neither party disputes a physical altercation occurred that evening. Nor do the parties dispute Mr. Borges' resulting injuries. Rather, the parties disagree about the characterization of the physical altercation and, thus, Mr. Gautier's entitlement to a discharge of the resulting debts.

[1] The Court has jurisdiction over the parties and Mr. Borges' claim pursuant to 28 U.S.C. §§ 1334 and 157(a) and Local Rule 109(a) of the United States District Court for the District of Rhode Island. This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(I). The parties have consented to the Court's entry of final orders and judgment on all claims. Venue is appropriate pursuant to 28 U.S.C. §§ 1408 and 1409 as Mr. Gautier resides in Rhode Island.

The Court held a one-day trial on April 17, 2026 (the "Trial") during which Mr. Borges and his sister, Christina Borges, testified in support of his claim and Mr. Gautier testified in support of his defense. The testimony from the Plaintiff's witnesses described an unprovoked battery while Mr. Gautier's testimony painted a very different picture—a light "scuffle" between a homeowner and an intoxicated visitor attempting to enter the family home. Consequently, this case turns on witness credibility. Following consideration of the witness testimony and documentary evidence presented during the Trial, and for the reasons explained herein, the Court concludes that Mr. Borges has met his burden of proof.

## II. FACTS & PROCEDURAL HISTORY[2]

### A. Events Preceding May 6, 2023

Mr. Borges was a plasterer by trade and began working for Mr. Gautier's contracting company as a full-time subcontractor in 2022.[3] Around the same time, Mr. Borges generally stopped consuming alcohol after being charged with driving under the influence ("DUI").[4] With 30 years in the trade, Mr. Borges' scope of work included Sheetrocking, plastering, drywall installation, and skimming of older walls.[5] As a matter of daily business, Mr. Borges would go to Mr. Gautier's home, retrieve materials needed for the day, and confirm the location of the jobsite

[2] The Court finds the following facts pursuant to Federal Rule of Civil Procedure 52(a)(1), made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7052. *See* Fed. R. Civ. P. 52(a)(1); Fed. R. Bankr. P. 7052. The facts were either not disputed by the parties, reflected on the dockets of Mr. Gautier's bankruptcy case, this adversary proceeding or Mr. Borges' action pending in the Rhode Island Superior Court, or found by the Court following the presentation of testimonial and documentary evidence during the Trial, the Court's assessment of the credibility of witnesses, and applicable law. To the extent an item described as a finding of fact is a conclusion of law (or the inverse), the Court adopts it as such.

[3] *See* Doc. #33 ("Trial Tr.") 12:11-24; 89:13-18.

[4] *See* Trial Tr. 12:23-24; 40:11-18.

[5] *See* Trial Tr. 13:2-4.

with Mr. Gautier.[6] If Mr. Borges had driven other subcontractors around, he would drop them off on the way home.[7] Mr. Borges would generally work six to seven hours a day, though the number of days he worked each week varied.[8] Mr. Gautier paid Mr. Borges a daily rate of $160 with payment made on a weekly basis by varying methods: check, in-person, or cash-app.[9] Mr. Borges estimated that he was making $1,000 a week.[10] When questioned about Mr. Borges' pay, Mr. Gautier's responses were vague, nonresponsive, and noncommittal.[11]

During the course of their working relationship, Mr. Borges would wait to hear from Mr. Gautier regarding how and when he was going to be paid, which usually occurred on a Friday.[12] Often, Mr. Borges would go to Mr. Gautier's home on a Friday to pick up his pay.[13] The parties agreed that prior to the incident that brought about these proceedings, their working relationship was straightforward and congenial.[14] Nevertheless, they disputed whether they had a relationship outside of work.[15] While Mr. Borges stated that they "never hung out," Mr. Gautier maintained

---

[6] *See* Trial Tr. 13:14-19.

[7] *See* Trial Tr. 13:20-22.

[8] *See* Trial Tr. 89:19-20; 90:2-10.

[9] *See* Trial. Tr. 13:23-25; 14:1-4; 90:11-12.

[10] *See* Trial Tr. 36:4-5.

[11] *See* Trial Tr. 90:2-15. For example, when asked how much he paid Mr. Borges per day he stated, "I think it was $160." When asked if he remembered how much, on average, Mr. Borges earned a week, Mr. Gautier said, "I don't recall." The Court does not find Mr. Gautier's testimony as to Mr. Borges' pay to be credible.

[12] *See* Trial Tr. 14:1-9.

[13] *See* Trial Tr. 14:5-9.

[14] *See* Trial Tr. 15:6-12; 62:24-25; 63:1-7.

[15] *Compare* Trial Tr. 15:6-9 *with* 100:23-25; 101:1-5.

that Mr. Borges and his wife would join his family for "Easter, any holiday, all holidays" and that Mr. Borges "was considered a family friend."[16]

On May 5, 2023, Mr. Borges and another employee had finished a job in the Federal Hill neighborhood of Providence.[17] In the normal course, Mr. Borges called Mr. Gautier to confirm that the job was complete and to collect his weekly pay.[18] While Mr. Borges' initial calls went unanswered, Mr. Gautier eventually connected with Mr. Borges and explained that he could not pay Mr. Borges and the other employee in full because a check from another project had not cleared.[19] Mr. Gautier assured Mr. Borges that he would resolve the issue.[20] The parties disputed whether Mr. Gautier said that he would pay the remaining amount or otherwise address the issue the next day.[21] After their call, Mr. Borges sent a text message to Mr. Gautier relaying the frustrations of the other employee.[22] Mr. Gautier did not immediately reply to the text message.[23]

---

[16] *See* Trial Tr. 15-9; 100:23-25.

[17] *See* Trial Tr. 14:12-13.

[18] *See* Trial Tr. 14:5-15.

[19] *See* Trial Tr. 14:13-20; 91:11-13.

[20] *See* Trial Tr. 91:14-19.

[21] *Compare* Trial Tr. 14:18-22 *with* Trial Tr. 91:14-22.

[22] *See* Trial Tr. 14:25; 15:1-5.

[23] *See* Trial Tr. 91:23-25; 92:1-6.

B. <u>May 6, 2023</u>

Ms. Borges and her boyfriend[24] were dining at Lee's Chinese Restaurant in Riverside, Rhode Island in the early evening of May 6, 2023.[25] At some point, Mr. Borges joined them.[26] Although he did not order anything for himself, Mr. Borges enjoyed a few bites of the couple's appetizer and some of their scorpion bowl—a type of alcoholic beverage.[27] After they left the restaurant, Mr. Borges drove the group to Mr. Gautier's home to get his money.[28] Ms. Borges' boyfriend was in the front passenger seat and Ms. Borges was in the seat behind him.[29]

The group arrived at Mr. Gautier's home a little before 8:00 p.m.[30] Mr. Borges parked approximately thirty-five (35) feet away from the porch and front entrance of Mr. Gautier's home.[31] After parking, he exited the vehicle alone, leaving his sister and her boyfriend in the car.[32] When he arrived at the front door of the home, Mr. Borges rang the doorbell and knocked a couple of times.[33] Mr. Gautier did not come to the door initially because he was upstairs putting his kids

---

[24] During the Trial, Mr. Borges referred to the gentlemen dining with Ms. Borges as his brother-in-law while Ms. Borges referred to him as her boyfriend. For the sake of clarity, the Court shall refer to the gentlemen as Ms. Borges' boyfriend.

[25] *See* Trial Tr. 71:5-6.

[26] *See* Trial Tr. 17:23-24; 71:7-10.

[27] *See* Trial Tr. 18:19-24; 19:1-7; 40:1-4; 77:9-23.

[28] *See* Trial Tr. 17:18-21; 19:13-17; 72:10-13.

[29] *See* Trial Tr. 78:9-11; 19:22-23.

[30] *See* Trial Tr. 39:16-20; 50:7-10; 51:16-19; 90:25; 91:1.

[31] During the Trial, Ms. Borges testified that the porch (front entrance) to Mr. Gautier's home was approximately the same distance as the exit sign located above the entrance to the Courtroom, which the Court finds is approximately 35 to 40 feet from the witness stand where Ms. Borges was sitting. *See* Trial. Tr. 73:18-24.

[32] *See* Trial Tr. 73:16-17.

[33] *See* Trial Tr. 20:24-25; 21:4-6; 52:16-22; 74:15-17.

to bed.[34] Mr. Borges continued to knock because he wanted to be paid and knew Mr. Gautier was home due to his work vehicle being parked in front of the home.[35]

Although unclear what prompted him to do so, Mr. Gautier sent Mr. Borges a text message at 8:01 p.m. asking Mr. Borges to "give [him] a second" and stating that he "just had a chance to sit down" and would "get back to [Mr. Borges] within an hour."[36] Mr. Borges testified that he did not see nor hear the text message that Mr. Gautier sent him at 8:01 p.m. on May 6, 2023.[37]

Mr. Gautier was upstairs when he heard noises that he described as a "very loud bang at [his] front door" akin to a knocking sound.[38] Mr. Gautier testified that he looked out his bedroom window and saw two unfamiliar people standing outside of a vehicle that he did not recognize with its doors open.[39] As a result, Mr. Gautier proceeded to the front door to investigate the situation.[40] Upon opening the door, Mr. Gautier recognized Mr. Borges and confronted him about his presence at his home.[41] Mr. Borges testified that he was not mad at Mr. Gautier when he went to Mr. Gautier's home, nor did he threaten, push, or otherwise act aggressively towards him.[42]

---

[34] *See* Trial Tr. 92:21.

[35] *See* Trial Tr. 21:7-11; 50:16-25; 51:1-7.

[36] *See* Trial Ex. 5 at 1.

[37] *See* Trial Tr. 34:1-3.

[38] *See* Trial Tr. 92:22-25; 93:1-6.

[39] *See* Trial Tr. 93:8-21.

[40] *See* Trial Tr. 93:22-24.

[41] *See* Trial Tr. 21:18-21; 94:16; 95:1-2.

[42] *See* Trial Tr. 38:2-12.

Ms. Borges witnessed Mr. Gautier open the front door and "his arm swing back and hit" Mr. Borges.[43] From her vantage point, she could not determine whether Mr. Borges said anything to Mr. Gautier.[44] After being struck, Mr. Borges lost his balance and fell down the stairs leading to the front door.[45] Mr. Borges' head hit the concrete.[46]

Someone called the police and an ambulance.[47] Both parties were charged with disorderly conduct.[48] The responding paramedics assessed Mr. Borges' injuries, which included lacerations to his head and face, bruising to his body, and minor abrasions to both hands, and transported him to Rhode Island Hospital for further treatment.[49] While being treated by the paramedics, Mr. Borges admitted to drinking alcohol.[50] At the hospital, Mr. Borges received treatment consisting of diagnostic testing and sutures for the lacerations he sustained to his face.[51] Mr. Borges was subsequently discharged and billed for $16,566.80 for the hospital visit and $2,453 for the ambulance transport.[52] Mr. Borges did not seek follow-up care despite being directed to do so by his treating medical providers.[53]

---

[43] *See* Trial Tr. 79:8-9; 79:19-22.

[44] *See* Trial Tr. 79:25; 80:1-9.

[45] *See* Trial Tr. 21:25; 22:2-3; 74:8-10; 75:19-22. *See* Trial Ex. 1, Narrative (stating "the door open[ed] and he was struck in the face by closed fist, he fell backwards down approximately 5 steps where he struck his head").

[46] *See* Trial Tr. 22:4-5; 22:24.

[47] *See* Trial Tr. 25:20-21; 43:1-11; 81:1-7.

[48] *See* Trial Tr. 42:10-17; 44:9-13; 49:7-8; 50:1-2.

[49] *See* Trial Tr. 26:12-16; Trial Ex. 1, Narrative; Trial Ex. 2; Trial Ex. 3; Trial Ex. 4.

[50] *See* Trial Ex. 1, Narrative; *see also* Trial Tr. 42:20-25.

[51] *See* Trial Ex. 3 at 3; Trial Ex. 4; Trial Tr. 26:19-25; 27:10.

[52] *See* Trial Ex. 4 at 1; Trial Ex. 2.

[53] *See* Trial Tr. 36:11-13; 39:2-12.

C. After May 6, 2023

The next day, Mr. Gautier sent Mr. Borges an apology[54] text message stating:

> Hey John I hope you're ok buddy I am sorry about last night. I really apologize man. I hope you're ok I am going to pay you just waiting for a check to clear hopefully Monday Tuesday. If you need anything besides that please let me know. Again I'm sorry hope you can forgive me.[55]

Mr. Borges responded with "Steve absolutely." Mr. Gautier sent another text message stating:

> I get it my door bell don't work. I was in a bad mood. It sounded like you were kicking the door. And I seen 2 other people. I thought something else … then I was thinking today John's not like that to me. So I want to apologize for the way I acted. Your decent human being. You don't deserve that. If you need anything please let me know.[56]

Mr. Borges responded, stating "[i]t's all good . . . I need a week to heal up if you have work n would let me I'd still work . . ."[57] Regarding these responses, Mr. Borges testified that he maintained friendly contact with Mr. Gautier following the altercation because he was "not mad about the whole incident" and wanted to "make sure . . . that [he] got what was owed to [him], which was the rest of [his] $1,000 pay that [Mr. Gautier] owed [him]."[58]

In the following weeks, Mr. Borges experienced severe bruising and swelling on his face and head because of the injuries he sustained, including scarring above his eye and on the top of his head.[59] Mr. Borges was out of work for three months and could not return to his work in the

---

[54] *See* Trial Tr. 100:18-20.

[55] *See* Trial Tr. 34:11-16; Trial Ex. 5 at 1;

[56] *See* Trial Tr. 35:7-13; Trial Ex. 5 at 2.

[57] *See* Trial Ex. 5 at 2.

[58] *See* Trial Tr. 35:18-22.

[59] *See* Trial Tr. 28:12-17; 28:23-24; 36:18-21.

trades due to the "bruising o[n] [his] ribs" and "not working or being immobilized because of the injuries . . ."[60]

In early September 2023, Mr. Borges commenced a civil action against Mr. Gautier in the Rhode Island Superior Court (the "State Court") for assault and battery (Doc. # 1-1, "State Complaint"). The State Complaint alleged that Mr. Gautier physically assaulted and battered Mr. Borges on May 6, 2023, resulting in injury, mental suffering and anguish, lost wages and medical costs.[61] The State Complaint sought compensatory damages, punitive damages, and attorney's fees and costs associated with the state action. Although the State Complaint and related summons were duly served on Mr. Gautier, Mr. Gautier failed to respond or otherwise plead.[62] In late January of 2024, Mr. Borges filed an Affidavit and Request for Entry of Default (Doc. #1-2, "Request for Default") in the State Court, resulting in the entry of default against Mr. Gautier on February 8, 2024.[63] Mr. Gautier's attempt to vacate the entry of default in December of 2024 failed.[64]

Mr. Gautier commenced a chapter 13 case in this Court on June 10, 2025, which was subsequently converted to a chapter 7 case on July 8, 2025. *See* Bk. No. 25 10473, Doc. ##1, 28. On July 11, 2025, Mr. Borges filed his Complaint in this matter, attaching the State Complaint and an Affidavit and Request for Entry of Default (Doc. #1-2, "Request for Default"). The Complaint referenced his pending state claims for assault and battery, described the alleged battery, asserted

---

[60] *See* Trial Tr. 36:3-10.

[61] *See* State Complaint ¶¶ 4-9.

[62] *See* Trial Tr. 104:2.

[63] *See* Request for Default; Doc. #5 (the "Answer") ¶ 10.

[64] *See* Trial Tr. 103:13-25; 104:1-2; 117:4-25; 118:1-10.

that Mr. Gautier's actions were "willful and malicious (intentional without just cause)" and "caused [him] injury (harm that was intended or certain . . . to result from [Mr. Gautier's] actions) . . . ."[65] The Complaint further alleged that Mr. Borges had "incurred $19,019.60 in medical costs, physical and emotional pain[,] and ha[d] suffered permanent scarring due to the assault and battery committed by [Mr. Gautier]."[66] The Complaint asked the Court to hear and liquidate Mr. Borges' claim for damages sought in the State Complaint.[67] The Complaint also sought the award of costs and fees incurred in pursuing this action.[68]

D. The Trial

During the trial, Mr. Borges testified that he was 45 years old and employed full-time as a security guard, making $18.00 an hour and overtime when it "pops up."[69] He further testified that he had discoloration on the top of his head and above his right eye due to hitting the concrete.[70] Regarding these scars, Mr. Borges could not affirmatively state whether the scars had faded at all since the incident. Rather, he stated that "I don't really look at – I mean, I try not to look at it. It's kind of hard when you look in the mirror and that's all you can see. But I don't know."[71] The Court admitted five photographs of Mr. Borges' face, which he testified were taken two days after

[65] *See* Complaint ¶¶ 5-8.

[66] *See* Complaint ¶ 9.

[67] *See* Complaint at 3.

[68] *Id.*

[69] *See* Trial Tr. 13:7-8; 62:1-11.

[70] *See* Trial Tr. 16:19-25; 17:7-15. *See* Trial Ex. 6.

[71] *See* Trial Tr. 36:18-25.

the altercation or around that time.[72] Mr. Borges did not testify or otherwise offer into evidence any documentation supporting fees incurred in relation to the present proceeding or the state action.

In his closing arguments, Plaintiff Counsel gave a summation of the damages sought, including those for medical costs, lost wages, pain and suffering, scarring, and punitive damages. Plaintiff Counsel requested $13,000 for lost wages due to Mr. Borges being out of work for three months.[73] He requested $39,000 for 13 weeks of pain and suffering, suggesting that Mr. Borges pain and suffering was worth three times the amount of his paycheck.[74] Plaintiff Counsel also requested damages in the amount of $186,000 for scarring that Mr. Borges has on his face and the top of his head.[75] In support, Plaintiff Counsel suggested that $100 a week was reasonable and appropriate compensation for Mr. Borges' scarring.[76] Plaintiff Counsel arrived at the total figure of $186,000 by multiplying $100 by 52 weeks, which totals $5,200 a year. Next, Counsel multiplied $5,200 by 35.8, which he asserted represents the years of life expectancy for a forty-two-year-old male as of 2021.[77] Finally, Plaintiff Counsel sought punitive damages, suggesting that the Court should double the total of the aforementioned damages, which he estimated would be around $500,000.[78]

---

[72] *See* Trial Ex. 6; *see* Trial Tr. 29:18-25; 30:1-25; 31:1-25.

[73] *See* Trial Tr. 150:2-4.

[74] *See* Trial Tr. 150:8-14.

[75] *See* Trial Tr. 150:19-23; 151:15-18.

[76] *See* Trial Tr. 150:22-23.

[77] *See* Trial Ex. 7. The Court notes that Plaintiff Counsel's suggested figure of $186,000 for scarring damages is $160 short of the resulting sum ($186,160) based on the equation he relied upon in his summation.

[78] *See* Trial Tr. 151:22-25; 152:1-14.

In closing arguments, Defendant's Counsel suggested that absent medical costs, there was no evidence in the record supporting the amounts suggested by Plaintiff's Counsel. Defendant's Counsel further questioned for the first time the Court's jurisdiction to rule on the award of damages in this proceeding. Although the Court permitted the parties to file supplemental memoranda addressing the issue, the Defendant subsequently acknowledged the Court's jurisdiction to adjudicate damages. *See* Doc. ##29, 31.

## III. APPLICABLE LAW

As a preliminary matter, the Court finds that neither the doctrine of res judicata or collateral estoppel apply to this proceeding. Although Plaintiff's Counsel appeared to raise the issue during the Trial,[79] Mr. Borges failed to submit a copy of a default judgment or otherwise argue that the entry of default pursuant to Rule 55(a) of the Rhode Island Superior Court Rules of Civil Procedure is akin to a "final and valid judgment" for purposes of applying either doctrine. *See Davis v. Wood Ests., Inc.*, 354 A.3d 119, 133 (R.I. 2026) (stating in relevant part that "[t]he application of collateral estoppel requires . . . a final judgment on the merits . . ." in a prior proceeding (internal citation omitted)); *E.W. Audet & Sons, Inc. v. Fireman's Fund Ins. Co. of Newark, N.J.*, 635 A.2d 1181, 1186 (R.I. 1994) (discussing the application of the doctrines of res judicata and collateral estoppel and respective elements); *Zalobowski v. New England Teamsters & Trucking Indus. Pension Fund*, 410 A.2d 436, 437 (1980) (explaining that "the doctrine of res judicata which acts as an absolute bar to the relitigation of the same claim between the same parties when a final judgment has been rendered on the merits"); R.I. Super. R. Civ. P. 55(a) (providing for entry of default by clerk when a "party against whom a judgment for affirmative relief is sought has failed to plead of otherwise defend").

[79] *See* Trial Tr. 45:19-25; 46:3-11.

Based on the record before it, the Court finds that the State Court entered Mr. Gautier's default (as opposed to a default judgement) and did not liquidate Mr. Borges' damages prior to the commencement of this proceeding. *See Calise v. Hidden Valley Condo. Ass'n, Inc.*, 773 A.2d 834, 838 (R.I. 2001) ("[A] default judgment may not be entered without a hearing on damages unless the amount claimed is liquidated or ascertainable from definite figures contained in documentary evidence or detailed affidavits." (quoting *Bashforth v. Zampini,* 576 A.2d 1197, 1200 (R.I. 1990))). Consequently, neither doctrine precludes the Court from deciding the issues of Mr. Gautier's liability and the award of damages pursuant to § 523(a)(6).

A. Section 523(a)(6)

"The Bankruptcy Code aims to strike a balance between providing debtors with a fresh start by discharging debts . . . and avoiding abuse of the system." *Sauer Inc. v. Lawson (In re Lawson)*, 791 F.3d 214, 218 (1st Cir. 2015). "To this end, [§ 523(a)] exempts from discharge certain types of debt in an attempt to 'limit[] th[e] opportunity [for discharge] to the honest but unfortunate debtor.'" *Id.* (quoting *McCrory v. Spigel (In re Spigel)*, 260 F.3d 27, 32 (1st Cir. 2001) (second and third alteration in the original).

Thus, "[s]ome debts cannot be eliminated in bankruptcy. If a debtor has caused a 'willful and malicious injury' to someone else, any debt arising from that injury can be nondischargeable." *Simões v. Sivieri (In re Sivieri)*, 657 B.R. 303, 308 (B.A.P. 1st Cir. 2024) (quoting 11 U.S.C. § 523(a)(6)). As the creditor seeking the nondischargeability determination, Mr. Borges bears the burden of proving his claim under § 523(a)(6) by a preponderance of the evidence. *See Grogan v. Gardner*, 498 U.S. 279, 287 (1991). To prevail under § 523(a)(6), Mr. Borges "must show: (1) [Mr. Gautier] injured him or his property; (2) [Mr. Gautier's] actions were willful; and (3) [Mr. Gautier's] actions were malicious." *Gray v. Tacason (In re Tacason)*, 537 B.R. 41, 49 (B.A.P. 1st Cir. 2015) (citing *Jones v. Svreck (In re Jones)*, 300 B.R. 133, 139 (B.A.P. 1st Cir. 2003)).

"'Exceptions to discharge are narrowly construed in furtherance of the Bankruptcy Code's 'fresh start' policy,' and, for that reason, [Mr. Borges] must show that his claim comes squarely within [§ 523(a)(6)]." *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997) (quoting *Century 21 Balfour Real Estate v. Menna (In re Menna)*, 16 F.3d 7, 9 (1st Cir. 1994)).

"Although key to the inquiry, 'willful and malicious injury' lacks definition in the Bankruptcy Code." *Albert v. Nason (In re Nason)*, 654 B.R. 644, 647 (Bankr. D. Me. 2023). Thus, "courts are left to derive meaning from other sources with similar concepts, often the Restatement of Torts." *In re Sivieri*, 657 B.R. at 308 (citing *In re Nason*, 654 B.R. at 647, 648 & n.3 (collecting cases and noting instructive sections and comments of the Restatement (Second) of Torts)). The Bankruptcy Appellate Panel for the First Circuit has recognized a "substantial overlap between the 'willful and malicious injury' phrase, as interpreted, and more modern views on civil liability for intended consequences, as offered in the Restatement . . . ." *In re Sivieri*, 657 B.R. at 308 (comparing *Tinker v. Colwell*, 193 U.S. 473 (1904), *and DeWitt v. Stewart (In re Stewart)*, 948 F.3d 509, 528 (1st Cir. 2020), *with* Restatement (Second) of Torts § 870 & cmts. a-o).

*i. The "Willful" Requirement*

"To come within the purview of this section, the debtor must have intended the consequences of the act, not just the act itself. '[D]ebts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6).'" *Stewart Title Guar. Co. v. McCarthy (In re McCarthy)*, 473 B.R. 485, 495 (Bankr. D. Mass. 2012) (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 64 (1998))*; see In re Tacason*, 537 B.R. at 50 (stating that "'[w]illfulness' requires a showing of intent to injure or at least of intent to do an act which the debtor is substantially certain will lead to the injury in question" (citing *Geiger*, 523 U.S. at 57; *Old Republic Nat'l Title Ins. Co. v. Levasseur (In re Levasseur),* 737 F.3d 814, 818 (1st Cir. 2013))); *Birch Hollow, LLC v. Tardugno (In re Tardugno)*, 510 B.R. 12, 21 (Bankr. D. Mass. 2014) (stating a

plaintiff must demonstrate a "deliberate or intentional injury or that by [the defendant's] conduct there was substantial certainty that injury would result").

In *Geiger*, the Supreme Court clearly confined "willful" to mean "only acts done with the actual intent to cause injury . . . ." *Geiger*, 523 U.S. at 61. Thus, Mr. Gautier "must have desired for the voluntary act to cause a harmful consequence or at least believed that the act was substantially certain to do so." *In re Nason*, 654 B.R. at 647-48 (citing *McAlister v. Slosberg (In re Slosberg)*, 225 B.R. 9, 17-19 (Bankr. D. Me. 1998) (discussing *Geiger* and the Restatement (Second) of Torts § 8A & cmt. b)). Mr. Borges can establish Mr. Gautier's desire or belief at the time of the altercation with circumstantial evidence. *See In re Sivieri*, 657 B.R. at 309 (citing *Trenwick Am. Reins. Corp. v. Swasey (In re Swasey)*, 488 B.R. 22, 34-41 (Bankr. D. Mass. 2013)); *In re Nason*, 654 B.R. 648 (same). "Such evidence must manifest [Mr. Gautier's] subjective perception." *In re Sivieri*, 657 B.R. at 309 (citing *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1142-46 (9th Cir. 2002)). "That is, [Mr. Borges] cannot meet the burden of proof by showing only what a reasonable person would or should realize in the circumstances because such a showing would not establish that [Mr. Gautier] acted with more than negligence or recklessness, as is required." *Id.* (citing *In re Su*, 290 F.3d at 1145-46); *Sega Auto Sales, Inc. v. Flores (In re Flores)*, 535 B.R. 468, 486-87 (Bankr. D. Mass. 2015) (noting that substantial certainty analysis "must be subjective and rooted in what the debtor actually knew" and "requires that [the court] nonetheless consider the [d]ebtor's subjective intent, even if his beliefs were wholly unreasonable"). However, Mr. Borges can carry his burden by "showing circumstantial evidence of [Mr. Gautier's] knowledge or beliefs so as to sufficiently contradict that [Mr. Gautier's] self-reported perspective." *Id.* (citing *In re Su*, 290 F.3d at 1146 n.6).

B. The "Malicious" Requirement

"Although the term 'injury' is not defined by the Bankruptcy Code, it is understood to mean a 'violation of another's legal right, for which the law provides a remedy.'" *In re Tacason*, 537 B.R. at 50 (quoting *First Weber Grp., Inc. v. Horsfall*, 738 F.3d 767, 774 (7th Cir. 2013). "An injury is malicious if it was wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will." *Id.* (quoting *In re Levasseur*, 737 F.3d at 818). "The injury must have been committed in 'conscious disregard of one's duties.'" *Id*. (quoting *In re Levasseur*, 737 F.3d at 818). Thus, Mr. Borges must prove that Mr. Gautier inflicted injury "without justification or excuse." *Tardugno*, 510 B.R. at 21; *see In re Nason*, 654 B.R. at 651; *Gomes v. Limieux (In re Limieux)*, 306 B.R. 433, 439-40 (Bankr. D. Mass. 2004); *Slosberg*, 225 B.R. at 21.

> Stitching these definitional threads [of "willful" and "malicious"] together leads to a four-part test for determining nondischargeability under § 523(a)(6): (1) the creditor suffered an injury; (2) the injury was the result of the debtor's actions; (3) the debtor intended to cause the injury or there was a substantial certainty the injury would result from the debtor's act; and (4) the debtor had no just cause or excuse for the action resulting in injury.

*In re Tacason*, 537 B.R. at 50 (citing *Hermosilla v. Hermosilla (In re Hermosilla)*, 430 B.R. 13, 22 (Bankr. D. Mass. 2010); *Bauer v. Colokathis*, 417 B.R. 150, 157-58 (Bankr. D. Mass. 2009)).

## IV. ANALYSIS

*A. Is Mr. Gautier Liable?*

The parties do not dispute that Mr. Borges was injured on the evening of May 6, 2023, satisfying the first element of the § 523(a)(6) query. To answer the remaining questions and crystallize the factual record before it, the Court must determine the credibility and weight of the parties' and Ms. Borges' conflicting testimony surrounding the altercation at the front door of Mr. Gautier's home and Mr. Gautier's subjective belief at the time of the incident.

The Court finds Ms. Borges to be generally credible and forthright in her testimony. Conversely, both parties' testimony and/or the documentary evidence admitted into evidence raised questions as to their veracity on certain issues (some more relevant than others), and thus, their respective accounts of the evening. As explained below, the Court has credited certain portions of the parties conflicting testimony when supported by other documentary and/or testimonial evidence or when the other party failed to rebut it.

*i. Were Mr. Borges' injuries the result of Mr. Gautier's actions?*

Mr. Borges and his sister maintain that Mr. Gautier struck Mr. Borges, causing him to fall backward onto the concrete below. Mr. Borges testified that Mr. Gautier hit him on the head with an object and then punched him in the face.[80] Although Ms. Borges testified that she did not know what her brother was hit with, she was clear that her brother was struck by Mr. Gautier; and Mr. Gautier's Answer to Interrogatories admitted that he was holding a beer bottle when he opened the door.[81]

During the Trial, Mr. Gautier denied striking Mr. Borges or harming him in any way.[82] Mr. Gautier maintained that he did not "intentionally try to push [Mr. Borges] off the stoop or try to hurt him" and that he "was trying to protect [his] kids."[83] He testified that when he opened the door, he said "why the [expletive] are you banging on my door at 8:00 at night."[84] He further testified that when he tried to close the door, Mr. Borges put his foot on the threshold to keep the

[80] *See* Trial Tr. 21:19-22; 22:1-5; 55:13-25.

[81] *See* Trial Ex. 13, Answer 5 ("In doing so, I placed a beer bottle I had down next to him while making sure he was ok.")

[82] *See* Trial Tr. 96:12.

[83] *See* Trial Tr. 97:6-8.

[84] *See* Trial Tr. 95:1-2.

door open, resulting in a "little scuffle."[85] In short, Mr. Gautier asserted that Mr. Borges' intoxication, placement of his foot in the door's threshold, and loss of balance following the "little scuffle" led to Mr. Borges' injuries. The Court is not convinced.

During cross-examination Plaintiff's Counsel impeached Mr. Gautier's testimony regarding the "little scuffle," offering into evidence an interrogatory that Mr. Gautier submitted during discovery.[86] There, Mr. Gautier reluctantly confirmed the absence of any reference to a "scuffle" or other physical altercation.[87] He acknowledged that it only referenced Mr. Borges' attempt to stick his foot in the threshold of the door and his subsequent fall, maintaining that it "wasn't worded correctly."[88] The Court does not find this credible given the significance of that detail to his defense.[89]

Based on the credible testimony of Ms. Borges, who witnessed Mr. Gautier strike Mr. Borges, coupled with the interrogatory and Mr. Gautier's unpersuasive rebuttal, the Court finds that Mr. Gautier deliberately struck Mr. Gautier on the head, resulting in Mr. Borges fall and subsequent injuries.

*ii. Did Mr. Gautier intend to cause the injury or was there a substantial certainty the injury would result from his action?*

Having found that Mr. Gautier deliberately struck Mr. Borges, the Court need not belabor the next point. "[A] vast majority of courts, citing *Geiger*'s reliance on the Restatement, [have

---

[85] *See* Trial Tr. 95:7-20; Trial Ex. 13, Answer 5.

[86] *See* Trial Ex. 13.

[87] *See* Trial Tr. 122:15-21.

[88] *See* Trial Tr. 122:19-21.

[89] Importantly, Plaintiff Counsel repeatedly impeached Mr. Gautier's credibility on other significant issues including a prior affidavit submitted in the State Court and Mr. Gautier's failure to maintain a copy of his Ring security camera footage, which he did not preserve and allowed to be deleted. *See* Trial Tr. 102:1-8; 103:18-25; 104:1-25; 105:1-4; 105:18-20; 126:18-25; 127:1-25; 130:4-11.

held] that injuries resulting from intentional acts known by the debtor to be 'substantially certain to cause injury' are nondischargeable, regardless of whether the debtor had a subjective intent to cause any injury at all." *Hermosilla*, 430 B.R. at 23–24 & n.50 (rejecting debtor's assertion that he did not intend the injury that resulted and explaining that *Geiger* does not require a debtor to intend the specific injury, just the "consequences of [the] act") (collecting cases)). Striking someone on the head is the kind of action where harm is substantially certain to occur.

The Court also finds that Mr. Gautier's text messages to Mr. Borges are both an admission and an explanation supporting his subjective beliefs leading up to and at the time he struck Mr. Borges. For example, "I was in a bad mood" "I thought something else" "I want to apologize for the way I acted. Your a decent human being. You don't deserve that."[90] Although Mr. Gautier testified that that he sent those messages because he "felt bad because [they] have family friends" and asked for forgiveness so they could "talk to each other [and] do business together . . . ." the Court did not find his testimony persuasive.[91] Rather, the Court viewed it as an unconvincing attempt to explain what is clearly an admission of wrongdoing.

Despite the parties' differing accounts, it is overtly clear that Mr. Gautier intentionally struck Mr. Borges and the Court has little pause as to whether the strike was a hand, closed fist, or a bottle. Regardless, the action of striking on the head was reasonably certain to injure Mr. Borges.

*iii. Did Mr. Gautier have "just cause or excuse" for the action resulting in the injury?*

As noted above, Mr. Gautier's version of events primarily rested on the occurrence of a "little scuffle," which the Court rejects. Thus, the Court must weigh the credibility of the witnesses' testimony regarding Mr. Borges' arrival at the home and the moments leading up to

---

[90] *See* Trial Tr. 35:7-12; Trial Ex. 5 at 2.

[91] *See* Trial Tr. 128:20; 129:1-9.

Mr. Gautier striking Mr. Borges to determine whether there was "just cause or excuse" for Mr. Gautier's willful action.

Putting the claims of a "little scuffle" aside, Mr. Gautier's testimony points to the following circumstances in support of his response to Mr. Borges arrival: (i) the presence of uninvited strangers at his home; (ii) the time of night Mr. Borges arrived at his home; (iii) the smell of alcohol on Mr. Borges' breath; (iv) Mr. Borges' demand for payment upon Mr. Gautier opening the door; (v) the presence of Mr. Gautier's children in the home; and (vi) Mr. Borges putting his foot in the door's threshold.

*People Mr. Gautier Didn't Recognize*:

Mr. Gautier initially testified to seeing two people that he did not recognize standing outside of the car and then subsequently testified that Ms. Borges was in the car before correcting himself and placing Ms. Borges and her boyfriend outside of the car.[92] For these reasons, the Court does not find Mr. Gautier's testimony credible as to seeing two strangers standing outside of his home, as opposed to sitting in a parked car. Importantly, however, Mr. Gautier was impeached as to his mental state during this incident. On direct examination, Mr. Gautier indicated that he was scared right before he opened the door to the house.[93] However, on cross-examination, Mr. Gautier was clear and confirmed that he was not at all scared at the time he opened the door to the house.[94] The Court finds this conflicting testimony seriously undermines Mr. Gautier's credibility.

[92] *Compare* Trial Tr. 93:19-21 *with* Trial Tr. 98:13-14; 99:9.

[93] *See* Trial Tr. 94:9-11.

[94] *See* Trial Tr. 118:11-25.

Regarding Mr. Borges' presence at the home, Mr. Borges testified that he did not believe he needed to be invited to the home because Mr. Gautier had told him that he would get the rest of his pay on Saturday[95] and that it was in the normal course of their working relationship for him to go to Mr. Gautier's home on a Friday or a weekend to pick up his pay.[96] While Mr. Gautier testified that he did not invite Mr. Borges to his home on Saturday, May 6, 2023,[97] he failed to rebut Mr. Borges' testimony that he would regularly pick up his pay on a Friday or Saturday. In turn, the Court is convinced that it was in the normal course for Mr. Borges to go to the house.

*Time of Night and the Presence of Kids in the House*:

The parties agreed that Mr. Borges arrived at Mr. Gautier's home around 8:00 p.m. at night. Mr. Gautier testified that his initial reaction was to "get him out of here, get him away from my kids, close the door."[98] He also testified that his kids were in fear,[99] albeit upstairs.[100] However, the Court is not convinced, considering the several credibility issues in Mr. Gautier's testimony.

*Smell of Booze and Mr. Borges' Foot in the Door Threshold*:

Mr. Gautier cited a strong smell of alcohol on Mr. Borges and the presence of his scared children in the home.[101] During the Trial, Mr. Borges' testimony regarding his consumption of alcohol on the evening of May 6, 2023, was contradicted by the testimony of Ms. Borges. Specifically, Mr. Borges admitted to having a few sips of his sister's alcoholic beverage because

---

[95] *See* Trial Tr. 14:22; 35:22-23; 51:14-15.

[96] *See* Trial Tr. 14:5-9.

[97] *See* Trial Tr. 90:23-24; 91:20-21. *But see* Trial Tr. 35:22-23 Trial Tr.

[98] *See* Trial Tr. 96:17-18; 101:18-20.

[99] *See* Trial Tr. 118:11-18.

[100] *See* Trial Tr. 92:21.

[101] *See* Trial Tr. 96:15-18.

there was no water on the table, while Ms. Borges testified there was indeed water on the table and that he had a "baby sip" of the couple's scorpion bowl.[102] For these reasons, the Court found that Mr. Borges' testimony regarding his minute consumption of alcohol lacked credibility, a finding further bolstered by the admitted medical records.[103] However, the Court finds Ms. Borges testimony credible as to Mr. Borges' consumption of alcohol despite the presence of water at the table.

On direct examination, Mr. Gautier testified that the "little scuffle" was the result of Mr. Borges putting his foot in the threshold of the doorway and that he closed the door to get him away from his children.[104] Even if Mr. Borges had put his foot in the threshold, the Court is not convinced that such an action arises to "just cause or excuse" to forcibly strike Mr. Borges, particularly in light of the fact that Mr. Borges testified that he was not fearful leading up to or during the incident. Furthermore, Mr. Gautier failed to testify that he asked Mr. Borges to leave or not enter the home before being struck. These facts are compounded by his failure to preserve the Ring security camera footage. It goes without saying that had Mr. Borges felt entirely justified in his actions, he would have preserved this critical piece of evidence that could have supported his arguments.[105]

Having ironed out the factual record, the Court finds that Mr. Gautier lacked "just cause or excuse" to hit Mr. Borges in the face. The Court is not persuaded that Mr. Gautier was afraid of Mr. Borges or otherwise threatened by his presence, whether expected or not, at the house with

---

[102] *Compare* Trial Tr. 41:12-14 *with* Trial Tr. 77:24-25; 78:1; *see* Trial Tr. 72:1-3.

[103] *See* Trial Ex. 1; Trial Ex. 3.

[104] *See* Trial Tr. 96:15-18.

[105] To clarify, the Court does not find credible Mr. Gautier's testimony that the security camera was dead. *See* Trial Tr. 102:1-6.

two strangers in the car. Both men acknowledged their good working relationship and a lack of any incident prior to Mr. Borges' arrival that would support Mr. Gautier's belief that he or his kids were in danger. Moreover, while Mr. Borges arrived at or around 8:00 p.m. and Mr. Gautier was putting the children to bed, it was not the "middle of the night" and was a part of a regular pattern of conduct resulting from Mr. Borges' employment. Even if it were not a pattern of conduct, Mr. Gautier testified that Mr. Borges was routinely at his house and was like a part of the family. Furthermore, while the Court found that Mr. Borges had been drinking, the Court does not find that the consumption of a small amount of alcohol, coupled with repetitive knocking (or even banging) is "just cause or excuse," to immediately strike Mr. Borges, even when coupled with the other factual circumstances Mr. Gautier cites.

For these reasons, the Court finds that Mr. Gautier willfully and maliciously injured Mr. Borges without just cause or excuse.

*B. Damages*

Having determined that Mr. Gautier is liable for willfully and maliciously injuring Mr. Borges, any debt that flows from it is nondischargeable. *In re Nason*, 654 B.R. at 650 ("The bankruptcy court's mission is to determine whether [the defendant] willfully and maliciously injured [the plaintiff]. If so, any debt that flows from it, including the damages debt, is nondischargeable." (citing *Cohen v. de la Cruz*, 523 U.S. 213, 218-21 (1998) ("concluding that treble damages for fraud were nondischargeable under § 523(a)(2)(A), after determining that 'any debt' and repeated 'debt . . . for' phrasings in § 523(a) are meant to encompass all liability"))); *Dean v. Clavet (In re Dean)*, 628 B.R. 851, 857-58 (Bankr. D. Me. 2021) (explaining *Cohen's* logic "extended application to all liability arising from willful and malicious injury addressed in § 523(a)(6)"). Consequently, the Court must liquidate Mr. Borges' claim to determine the total amount of nondischargeable debt.

*i. Applicable Law*

Rhode Island law governs the underlying "assault and battery" claim. "Assault and battery are separate acts, usually arising from the same transaction, each having independent significance." *Picard v. Barry Pontiac-Buick, Inc.*, 654 A.2d 690, 694 (R.I. 1995) (citing *Proffitt v. Ricci*, 463 A.2d 514, 517 (R.I. 1983) (citing *generally*, Prosser, *Handbook of the Law of Torts* §§ 9 & 10 at 34–41 (4th ed. 1971)). "Since in most cases assault and battery arise out of a single transaction, it has become customary to refer in legal terminology to the term 'assault and battery' as if it were a legal unit or a single concept." *Proffitt*, 463 A.2d at 517. Relevant here is Mr. Borges' claim of battery, which "refers to an act that was intended to cause, and does cause, an offensive contact with or unconsented touching of or trauma upon the body of another . . . ." *Id.* (citing Prosser, § 9 at 35). "An intent to injure . . . , however, is unnecessary in a situation in which a defendant willfully sets in motion a force that in its ordinary course causes the injury. *Id.* (citing *Mooney v. Carter,* 160 P.2d 390, 392 (1945) (concluding that operating a car so as to throw plaintiff off a running board was sufficient to constitute assault)). "To constitute a battery, it is enough to set in motion willfully a force that in its ordinary course causes an injury." *Id.* The Court is satisfied that the factual record established herein supports a finding in favor of Mr. Borges' § 523(a)(6) claim and would also support his civil state law battery claim as intentionally hitting or striking someone in the face is "a force that in its ordinary course causes injury." *See id.*

In Rhode Island, "[c]ompensatory damages are awarded to a person in satisfaction of, or in response to, loss or injury sustained." *Proffitt*, 463 A.2d at 518 (citing *Auchincloss v. Halloran Construction Co.,* 253 A.2d 622, 625 (R.I. 1969); *DeSpirito v. Bristol County Water Co.,* 227 A.2d 782, 784 (R.I. 1967)). Rhode Island recognizes loss of earnings, pain and suffering, and cost of medical care as compensatory damages. *See Proffitt*, 463 A.2d at 518; *Arlan v. Cervini*, 478 A.2d 976, 980 (R.I. 1984) (holding that "mental suffering, which may include nervousness, grief,

anxiety, worry, shock, humiliation, embarrassment, or indignity, arising from consciousness of a facial or bodily scar, is a compensable element of damages"). "It is not a prerequisite to an award of compensatory damages that there be evidence of a plaintiff's medical bills, amount of lost wages, or value of lost property presented to the court." *Trainor v. Town of N. Kingstown*, 625 A.2d 1349, 1350 (R.I. 1993) (reversing and remanding the case and requiring the trial justice to "reexamine the testimony presented by plaintiff's witnesses and compute an award, if any, of compensatory damages. . . .").

"There is no particular formula . . . for computation of damages due to a plaintiff for pain and suffering." *Proffitt,* 463 A.2d at 518 (citing *Pimental v. Postoian,* 393 A.2d 1097, 1101 (R.I. 1978) (concluding that the trial justice erred in granting defendant's motion for new trial when finding no evidence to support the jury's award of compensatory damages where plaintiff had "testified that his neck became sore as a result of being struck . . . and that he caught a cold because he was inadequately clothed for the cold weather" and failed to produce evidence of medical bills or lost wages); *see Worsley v. Corcelli,* 377 A.2d 215, 217-18 (R.I. 1977)). Moreover, "the amount to be awarded for pain and suffering is a matter peculiarly within the province of the trier of fact, whether judge or jury." *Proffitt*, 463 A.2d at 519 (concluding that the trial justice was "well within the bounds of his discretion" when he awarded plaintiff for pain and suffering where the plaintiff "sustained a sore right leg, a discolored foot, and significant pain in his right knee in addition to experiencing difficulty while driving . . . and occasionally still needing to limp in order to favor his right leg" (citing *Fusaro v. Naccarato,* 237 A.2d 545, 547 (R.I. 1968)); *see Doe v. R.I. Sch. of Design*, 516 F. Supp. 3d 188, 196 (D.R.I. 2021) (following its own jury instructions on compensatory damages, which state "[a]ny amount awarded for bodily injuries or pain and suffering should be based upon the consideration of the nature, extent, and duration of such injuries and such pain and suffering. In addition, you may compensate a plaintiff for mental suffering,

which may include nervousness, anxiety, worry, shock, humiliation, embarrassment, or indignity. Mental suffering 'may include nervousness, grief, anxiety, worry, shock, humiliation, embarrassment, or indignity'" (quoting *Arlan*, 478 A.2d at 980)). The Rhode Island Supreme Court has approved of counsel suggesting in their summation the "per diem method" of evaluating pain and suffering damages in their summation. *Worsley*, 377 A.2d at 267-68 (adopting "the rule which permits counsel for the plaintiff . . . to use in summation to the jury the per diem method under proper instructions from the trial justice").

The Court also has "jurisdiction and the discretion to consider whether punitive damages are appropriate in dischargeability actions." *Espy v. Steven (In re Stevens)*, 647 B.R. 299, 335 (Bankr. E.D. Va. 2022) (collecting cases); *see also In re Dean*, 628 B.R. at 857 (noting that "neither the Supreme Court nor the First Circuit Court of Appeals have explicitly ruled on the dischargeability of punitive damages under [§] 523(a)(6)" and stating that Supreme Court dicta supports the holding of *Reynolds-Marshall*), *aff'd sub nom. Dean v. Clavet*, No. 2:21-CV-00150-LEW, 2021 WL 5815909 (D. Me. Dec. 7, 2021); *In re Keach*, 204 B.R. 851, 854 (Bankr. D.R.I. 1996) (aggreeing with majority view that § 523(a)(6)'s discharge exception includes liability for punitive damages); *Reynolds-Marshall v. Hallum (In re Reynolds-Marshall)*, 162 B.R. 51, 60 (D. Me. 1993) (holding that "[§] 523(a)(6) encompasses, as a matter of law, punitive as well as compensatory damages which arise from conduct adjudged to be willful and malicious").

"In order to enter an award of punitive damages, there must be a basis for such an award, under either state or federal law." *In re Jouett*, 512 B.R. 277, 295-96 (Bankr. N.D. Okla. 2014). "Where the Bankruptcy Code does not specifically provide for an award of punitive damages, the Court may award such damages by application of state law." *In re Stevens*, 647 B.R. at 335 (quoting *Levy v. Runnells (In re Landbank Equity Corp.)*, 83 B.R. 362, 382 (E.D. Va. 1987) (citing *Lisk v. Criswell (In re Criswell)*, 52 B.R. 184, 205 (Bankr. E.D. Va. 1985); *but see*

*In re Jouett*, 512 B.R. 277, 295-96 (Bankr. N.D. Okla. 2014) (declining to enter an award of punitive damages because the Bankruptcy Code did not provide for such damages under § 523(a) and relevant state law was not before the court and stating that court "will not ferret out the law beneficial to a party's position"). As this Court has previously explained:

> [p]unitive damages are awarded over and above what is necessary to compensate a party for ordinary losses, and Rhode Island permits the imposition of punitive damages in appropriate circumstances. Such damages are awarded not to compensate for injury or loss, but to punish the offender and to deter future misconduct.

*Geremia v. North Atlantic Fishing, Inc. (In re Reposa)*, 171 B.R. 722, 725 (Bankr. D.R.I. 1994), *amended on reconsideration*, 186 B.R. 775 (Bankr. D.R.I. 1995) (citing *Greater Providence Deposit Corp. v. Jenison*, 485 A.2d 1242, 1244 (R.I. 1984)). The Court will award punitive damages "only if the party seeking them produces 'evidence of such wil[l]fulness, recklessness or wickedness on the part of the party at fault, as amount[s] to criminality, which for the good of society and warning of the individual, ought to be punished.'" *Id.* at 725 (quoting *Morin v. Aetna Cas. & Sur. Co.*, 478 A.2d 964, 967 (R.I. 1984)). "Where it is found that the defendant acted maliciously or in bad faith, it is appropriate to award punitive damages." *Id.* (citing *Carvalho v. Coletta,* 457 A.2d 614 (R.I. 1983)). Importantly, Rhode Island does not require "punitive damages to be directly proportional to compensatory damages." *Id.* at 727.

*ii. Analysis*

Mr. Borges seeks damages for: (i) lost wages in the amount of $13,000; (ii) scarring in the amount of $186,000; (iii) medical costs in the total amount of $19,019.80; (iv) pain and suffering in the amount of $39,000; (v) attorney's fees and costs incurred in this action and the state action;

and (vi) punitive damages in the amount of approximately $500,000.[106] Defendant Counsel contends that the lack of expert testimony on the record regarding scarring or lost wages is problematic, and that the only evidence supporting an award of damages are the medical bills. He does not offer any reason or law in support of his position, nor does he explain why Mr. Borges' unopposed testimony regarding the three months of missed work and the mental impact of the scarring on him are deficient or not obvious to a lay person.

Regarding lost wages, Mr. Borges testified that he was making $1,000 per week and missed three months of work.[107] Mr. Gautier did not credibly rebut this testimony. In fact, he could not recall how much Mr. Borges made a week. For these reasons, the Court finds that the evidentiary record sufficiently supported Mr. Borges' entitlement to lost wages in the amount of $13,000 and that an expert is not needed because this is a simple mathematical equation derived from clear and unrebutted testimony, which is not "beyond common knowledge."[108]

Turning to his request for damages for scarring, Mr. Borges also identified discoloration on the top of his head and above his right eye, the aftermath of the lacerations he sustained to his face and head as a result of being hit in the face and falling on the concrete.[109] The areas of discoloration identified during the Trial align with the photos admitted into evidence, which reflect lacerations, bruising, and swelling in the same areas roughly three years earlier.[110] Regarding these

---

[106] During his summation, Plaintiff Counsel suggested that the Court should double Mr. Borges' other damages for the total of punitive damages sought, which he approximated to be around $500,000. Based on the other amounts provided by counsel, the requested punitive damages would be $514,039.60.

[107] *See* Trial Tr. 36:2-5; 150:2-4

[108] In Rhode Island, "it is also well established that 'expert testimony is required to establish any matter that is not obvious to a lay person and thus lies beyond common knowledge.'" *Almonte v. Kurl*, 46 A.3d 1, 18 (R.I. 2012) (quoting *Mills v. State Sales, Inc.,* 824 A.2d 461, 468 (R.I. 2003)).

[109] *See* Trial Tr. 16:19-25; 17:7-15; Trial Ex. 6.

[110] *See* Trial Ex. 6.

scars, Mr. Borges could not affirmatively state whether the scars had faded since the incident. Rather, he stated that "I don't really look at – I mean, I try not to look at it. It's kind of hard when you look in the mirror and that's all you can see. But I don't know."[111] The Court found his testimony, albeit concise, to be candid—revealing a degree of shame, embarrassment, or humiliation that Mr. Borges feels as a result of the scarring. *See Kay v. Menard*, 754 A.2d 760, 772 (R.I. 2000) ("[M]ental suffering, which may include nervousness, grief, anxiety, worry, shock, humiliation, embarrassment, or indignity, arising from consciousness of a facial or bodily scar, is a compensable element of damages." (quoting *Arlan,* 478 A.2d at 980 (overruling *Halladay v. Ingram,* 78 R.I. 464, 82 A.2d 875 (R.I. 1951)))). Additionally, the Court finds that the scaring is more likely than not permanent as it has remained visible for three years. For these reasons, the Court finds that an award for such scarring is appropriate. However, without more, the Court is not convinced that $100 per week for the next 35.8 years is the appropriate remedy under the circumstances. Based upon an evaluation of the evidence submitted and the testimony at trial, the Court hereby awards Plaintiff $35,800 in connection with said scarring.

Next, the Court finds that Mr. Borges is entitled to damages in the amount of $19,019.80 for the medical costs he incurred because of his injuries. Indeed, the admitted exhibits reflect that Mr. Borges was billed $16,566.80 for the hospital visit and $2,453 for the ambulance transport.[112] Mr. Borges testified that he did not seek any other treatments or incur additional medical expenses because of his injuries.[113] As a result, these costs are limited to the amounts incurred on May 6, 2023.

[111] *See* Trial Tr. 36:23-25.
[112] *See* Trial Ex. 4 at 1; Trial Ex. 2.

[113] *See* Trial Tr. 36:11-13.

The Court is not completely satisfied by Mr. Borges' testimony regarding his pain and suffering. By his own admission, Mr. Borges never sought additional treatment for his injuries. Nor did he testify to a definite period of time that he suffered as a result of those injuries. Rather, he said that some of his injuries hurt for "a while" and could not otherwise justify a period of time exceeding the three months he was unable to work.[114] Moreover, while Mr. Borges has not returned to work in the trades, he was able to return to work as a security guard. For these reasons, the Court finds that Mr. Borges experienced pain and suffering to a degree—namely, while he was unable to work due to his injuries. As a result, the Court awards Mr. Borges $13,000, which represents an additional $1,000 for each week Mr. Borges was out of work.

The Court turns next to the request for punitive damages. The Court does not view the imposition of punitive damages in this case as an appropriate punishment or deterrent for future conduct. In this case, the damages awarded are nondischargeable, which on its own serves as a significant deterrent to the type of conduct found in this case. Accordingly, the Court declines to impose punitive damages.

Finally, the Court shall address Mr. Borges' request for an award of attorney's fees in this proceeding and the action pending in the State Court. Mr. Borges failed to present any evidence during the Trial regarding the costs and/or fees he incurred in relation to the prosecution of this proceeding or his action in the State Court, nor has he identified a specific statutory basis entitling him to attorney's fees in this proceeding.

The Supreme Court recognizes "the bedrock principle known as the 'American Rule'" as its "'basic point of reference when considering the award of attorney's fees . . . .'" *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 126 (2015) (quoting *Hardt v. Reliance Standard Life Ins.*

[114] *See* Trial Tr. 37:1-13.

*Co.*, 560 U.S. 242, 252–253 (2010)). Pursuant to that rule "[e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Id*. (quoting *Hardt*, 560 U.S. at 252-53.)

Bankruptcy Rule 7054(b)(2) makes Rule 54(d)(2)(A)-(C) applicable to adversary proceedings. *See* Fed. R. Bankr. P. 7054(b)(2)(A)-(C); Fed. R. Civ. P. 54(d)(2)(A)-(C). Importantly, "[Rule] 54(d) does not create a substantive right to attorney's fees . . . ." *In re Quesos del Pais La Esperanza, Inc.*, No. 18-06529 (ESL), 2020 WL 1190630, at *2 (Bankr. D.P.R. Mar. 11, 2020) (citing *Madoff v. Amaral (In re Amaral)*, 567 B.R. 417 (Bankr. D. Mass. 2017)). Rather, it "establishes a procedure for presenting claims for attorney's fees as costs of the litigation." *In re Pinero*, No. 14-08168 (MCF), 2019 WL 2486744, at *2 (Bankr. D.P.R. June 13, 2019). *See MRO Communications v. Am. Tel. & Tel.*, 197 F.3d 1276, 1280-81 (9th Cir. 1999) (explaining that "Rule 54(d)(2) recognizes the possibility of awards of attorney's fees . . . and establishes a procedure for asserting a right to such an award. This rule does not provide a rule of decision, however. Rather, it and the accompanying advisory committee comment recognize that there must be another source of authority for such an award"). This is reflected in the plain language of the Rule, which requires the party seeking the award of attorney's fees to "specify the judgment and the statute, rule, or other grounds entitling the movant to the award[.]" Fed. R. Civ. P. 54(d)(2)(B)(ii). This requirement "gives effect to the 'American Rule' that each party must bear its own attorneys' fees in the absence of a rule, statute or contract authorizing such an award." *MRO Communications*, 197 F.3d at 1280-81 (citing *Sheet Metal Workers' Int'l Ass'n Local Union No. 359 v. Madison Indus., Inc.*, 84 F.3d 1186, 1192 (9th Cir. 1996)).

Federal courts have recognized certain exceptions to the American Rule. *In re Pinero*, 2019 WL 2486744, at *3. These exceptions include: (i) "the 'common fund exception,' [which is] derive[d] . . . . from [courts'] historic equity jurisdiction, and allows a court to award attorney's

fees to a party whose litigation efforts directly benefit others[;]" (ii) the assessment of "attorney's fees as a sanction for the willful disobedience of a court order"[;] and (iii) the assessment of "attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991) (citations omitted).

While the Court may have discretion to award attorney's fees pursuant to Rule 54(d)(2)(A)-(B), "such a request 'must be made by motion.'" *Chuipek v. Gilmore (In re Gilmore)*, 590 B.R. 819, 842 (Bankr. N.D. Ill. 2018) (quoting Fed. R. Civ. P. 54(d)(2)(A)). Additionally, the Court must exercise its discretion "with restraint." *Id.* (quoting *In re Roco Corp.*, 37 B.R. 770, 775 (Bankr. D.R.I. 1984) (finding a partial award of attorney's fees appropriate where litigation was being pressed mainly for the purpose of taking "another bite at an apple"). "Indeed, the court's authority to award such fees is not unrestricted and must be 'reserved for exceptional situations.'" *Id.* (quoting *Roco Corp.,* 37 B.R. at 775).

The Court finds no basis on the evidence put forward to depart from the American Rule and thus, declines to award attorney fees.

## V. CONCLUSION

This opinion constitutes the court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. The court will issue a separate judgment consistent with this opinion.

Date: September 17, 2026

John A. Dorsey, Jr.
United States Bankruptcy Judge
District of Rhode Island